BRYANS, Appellant,

v.

ENGLISH NANNY AND GOVERNESS SCHOOL, INC. et al., Appellees.

[Cite as *Bryans v. English Nanny & Governess
School, Inc.* (1996), 117 Ohio App.3d 303.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 69867.

Decided Dec. 30, 1996.

*Sindell, Lowe & Guidubaldi, Steven A. Sindell, Lynn E. Lebit* and *Dennis P. Mulvihill,* for appellant.

*Gallagher, Sharp, Fulton & Norman, Thomas E. Dover* and *Todd M. Haemmerle,* for appellees.

JAMES D. SWEENEY, Presiding Judge.

Plaintiff-appellant Jami R. Bryans appeals from the trial court's decision to grant the motion for summary judgment of defendants-appellees The English Nanny & Governess School, Inc. ("School") and English Nannies & Governesses, Ltd. ("English Nannies"). The School is a nonprofit entity that trains nannies and governesses. English Nannies is a for-profit entity that places the nannies and governesses. Bryans graduated from the School as a nanny.

The appellant asserted claims of discrimination based upon handicap, tortious interference with contract, fraud and misrepresentation, defamation, intentional infliction of emotional distress, and actual malice. The appellant prayed for compensatory damages, punitive damages, and attorney fees.

The appellant, after being admitted to and graduating from the School, was initially placed by English Nannies with the Seone family in Michigan. This

placement was of short duration, two weeks, after which time the appellant returned to the Cleveland area and again sought help from the appellees regarding a further placement. Although the appellant is currently employed full-time as a nanny, her position was not located through the appellees. The appellant has alleged various instances of discrimination and defamation that occurred during her association with the appellees.

The appellees filed a motion for summary judgment and the appellant filed her memorandum and evidence in opposition. The following five depositions were filed with the court and must be considered here: that of the appellant; that of Janet Axler, the assistant director of the School; that of Heather Goldberg, an employee of the appellees; and those of the appellant, Colleen Hanna and Rhonda Stefanski.

It is undisputed that the two entities which constitute the appellee are intertwined. The entities employ the same staff, whose job descriptions and responsibilities are blurred. Janet Axler screens potential applicants for the School, but assists in job placement for English Nannies. Heather Goldberg is the placement director, but she also teaches classes.

When a potential employer contacts the School, there is no formal posting of the position. Instead, someone presents the position to the class and students are given an opportunity to sign up for an interview. Once students sign up, the employer selects who will actually be interviewed. The School provides references to the potential employers for the students, but no investigation is done on the potential employers.

The students are generally encouraged to refrain from working during the months they are enrolled in the School. However, from time to time the school is asked for names of baby-sitters. Such positions are posted on the board at the School for all to see.

No fee is charged to receive certification as a nanny when the student is placed through English Nannies and maintains that employment for three months. If the student secures employment outside of English Nannies, the fee is $500.

In her deposition, Axler testified that when screening applicants for admission to the School, she looks for individuals who are emotionally stable and in good physical health, who come from nurtured backgrounds and have child care experience, and who truly love children. For example, a person who was taking medication which impaired reaction time or the ability to be cognizant of a small child's activities would not be eligible for admission. Axler testified at her deposition that she would not accept as a student a person in a wheelchair. She considers such limitations bona fide barriers which would preclude a person from becoming a nanny.

When assisting in placement through English Nannies, Axler informs potential employers whether a student is taking medication, has been on academic probation, or has a learning disability. Such personal information as a past bad sexual experience would not be revealed to potential employers, as it would not affect job performance. Axler testified that in her experience, it can take longer to place a student who has a disability. Axler stated that she did not indicate this to the appellant at the time of admission because, although it can take longer to place such a student, it is not necessarily so.

The appellant was interviewed by Axler prior to her acceptance into the School. Axler noted that the appellant has a slight speech impediment. Axler learned that the appellant also has a slight muscle weakness on one side that affects her writing. After the interview, Axler wrote "final approval depends on doctor's reference" on the bottom of the appellant's application for admission. Axler testified that the appellant's acceptance was contingent upon the appellant's doctor's approval. Over the years of her employment, Axler has made such a condition on many applications.

Subsequent to the interview, Axler learned from the appellant's physician that the appellant has a mild form of cerebral palsy. After this conversation with the appellant's physician, and upon the completion of the other portions of the standard screening process, the appellant was admitted to the School.

Axler did not place the appellant and testified that she did not know whether or not potential employers were informed that the appellant has a slight speech impediment. After the appellant's first placement was terminated, she was still eligible for placement through appellee English Nannies. Axler denied that she informed the appellant upon her return from Michigan that she would not permit the appellant to interview with families with infants and small children.

During her deposition, Axler was questioned regarding a telephone conversation with the appellant's attorney. Attached to the brief in opposition to the motion for summary judgment is an affidavit of attorney Lynn Lebit, affirming that during a conversation with Axler, Axler stated that it was her opinion that the appellant should not work with infants and small children because the appellant's speech disability would cause young children to develop abnormal speech patterns. Lebit affirms that Axler stated that she did not investigate with any physicians the truth of this belief. At her deposition, Axler testified that she did not recall this portion of the conversation and that she did not believe she would have said such a thing.

Axler also stated that she never informed the appellant that she should limit her job search to physician's families. Axler was not aware that someone made such a representation to the appellant. Axler testified that neither she nor

anyone else told the appellant upon her return from Michigan that she could not be placed.

One potential employer, Rhonda Stefanski, inquired about the appellant. Stefanski was a long-time client of the School. Axler informed Stefanski that she did not believe that the appellant was the correct person for the job. The Stefanskis have four active children, and the appellant had been discharged from a position with only one child. Axler believed that the position was more than the appellant could handle.

Heather Goldberg testified at her deposition that there was no discrimination against the appellant, and that the appellant was not told that it might be more difficult for her to secure employment. A policy exists that any disability of a student is not disclosed to potential employers. It is up to the client to interview a student and for the student to make her own decision. If a client requests that the applicants not be, for example, overweight or African–American, she responds that the School must send whoever signs up for the position. Most students are placed by the time they graduate, and under unusual circumstances it may take a month beyond graduation.

Goldberg deposed that she neither informed the appellant that she could interview only with doctor's families nor told the appellant that she could be placed only with families that did not have infants or small children. The information on the appellant was sent to two families after her return. Neither family chose to interview the appellant, and it was coincidence that both were physicians' families.

Goldberg stated that Axler also does placement. There is not one place in which all of the information is kept and although each had her own clients, both tended to know which positions were currently available. Stefanski never contacted Goldberg regarding the appellant; Stefanski was a client of Axler's.

Goldberg testified that she believes that the appellant has a difficult time performing the job of a nanny, but that her difficulties have nothing to do with her disabilities. Goldberg believes that the appellant lacks the requisite dedication to the job. After the placement with the Seone family failed, Goldberg was reluctant to place the appellant. She did, however, make efforts on the appellant's behalf.

In her deposition, the appellant stated that she graduated from high school, attended Lorain Community College for one year, and then sought admission to the School. Bryans testified that her speech impediment did not affect her education in any way. At her preadmission interview, Axler informed her that a physician's referral was needed prior to her admission. Until she sought out her

physician's approval, the appellant was unaware of the cause of her speech impediment. This was the first time she learned that she had cerebral palsy.

At the time of the interview, Axler also discussed job placement. The appellant was informed that everyone who had ever graduated from the School had been placed. Axler informed the appellant that she had placed individuals with more severe disabilities. Axler indicated she would not have a problem locating a position for the appellant.

When asked if Axler, at the time of the interview, made any statements that were meant to misrepresent or were fraudulent, the appellant responded that Axler stretched some things to make the School appear more desirable, but that overall, she was out of school and not stupid, and she knew what she was getting herself into. As a specific example, the appellant stated that she was informed that all students would be given an opportunity to interview for any position. This turned out not to be the case.

After graduation from the School and prior to her accepting the position in Michigan, the appellant called the School every day to inquire about employment opportunities. She was told not to call every day, that they were busy and she was bothering them. When postings came in she was not informed.

Although the appellant acknowledged that page two of the enrollment agreement states that there is an Ohio law prohibiting a school from guaranteeing job placement, she stated that that was not what Axler stated in the interview. It was her understanding that the School, regardless of the circumstances, would find her employment.

When she returned from Michigan, the appellant informed the School that she was interested in positions in the northeast Ohio area with infants or small toddlers. She contacted the School every day to inquire after job postings. There were two temporary positions which became available, but the appellant was not interested in those positions. The appellant testified that Janet Axler informed her during a telephone conversation that she would not sign the appellant up for any positions which had infants or small toddlers who were learning to speak. Bryans stated that she was shocked and wondered why the School would accept her tuition and then not permit her to obtain the position she desired. When she asked why, Axler stated that families would not want someone like her around small infants and toddlers teaching them to speak.

The appellant stated that she was told by someone at the School that not everyone would want someone with a speech impediment and that she would be better off working for doctors, since they were medically knowledgeable about her disease. This advice was given before she worked for the Seone family. The appellant also testified that while in school, she asked for baby-sitting jobs. She

was never offered those opportunities. No one ever indicated to her why she was not offered these opportunities. The appellant stated that while she was in school, she believed that the School was honest about available job opportunities. She subsequently learned that her roommates knew of jobs of which she was never informed.

The appellant believes that the School took her money knowing it would not find her a job or would have a difficult time finding her a job. Bryans has never received her certification. If the School had any doubts as to finding her a placement, Bryans believes that it should not have accepted her into the School.

When asked how she had been harmed, the appellant responded that her feelings were hurt, she was a wreck. She had to return to living off her parents and was unable to stand on her own two feet. She had gone through life without problems and then suddenly had a problem because of her speech impediment. She was promised a job by the School and felt that she deserved one.

When she was told that she should not work with infants and toddlers, the age limit given to her was five. The appellant stated that there are few jobs available where the children are over five because most employers are looking for a nanny at the time a child is born, or soon after.

The appellant testified in her deposition that her boyfriend's name is Anthony DeCarlo. DeCarlo has been employed on an as-needed basis for Colleen Hanna to provide child care services. The appellant knows of, but has never met, Rhonda Stefanski. DeCarlo knows Stefanski well because the Hannas and the Stefanskis are neighbors and the children play together. After the position at the Stefanskis was posted at the School, the appellant spoke to Hanna and decided not to apply.

The appellant later learned from Hanna that Hanna had talked to Stefanski about her. Stefanski called the School and inquired about the appellant. Hanna told the appellant that Stefanski told her that the School stated that since Stefanski had a small infant in her home, the appellant could not be recommended.

Colleen Hanna testified at her deposition that she employs the appellant's boyfriend, Tony DeCarlo. She had occasional contact with the appellant through this connection. Rhonda Stefanski is her neighbor and close friend. She spoke with Stefanski in June 1994 regarding the appellant.

Hanna stated that Stefanski had a conversation with the School regarding the appellant. The School would not recommend the appellant for a position with the Stefanskis because of the appellant's speech impediment. The Stefanskis have a one-year-old child and the School did not feel that it would be good for the child's language and speech development to have a person in the house with a speech

handicap. Stefanski did not tell Hanna with whom she spoke at the School. Hanna had previously made a written statement regarding her conversation with Stefanski, but had subsequently obliterated Stefanski's name. Stefanski indicated to Hanna that she would not become involved, and Hanna tried to honor the request.

During her deposition, Stefanski stated that she was seeking a new nanny and that Hanna suggested that she interview the appellant. Stefanski responded that she had already hired someone. Later, Hanna wondered why Stefanski was never given an opportunity to interview the appellant. Stefanski indicated that the next time she contacted the School she would ask about the appellant. She followed through and spoke with Axler regarding the appellant. Axler stated that the appellant was a lovely young lady, but that she had not signed up for the interview. Axler also indicated that the appellant would not have been the right fit for the Stefanski family. Stefanski testified that there was some mention of the appellant's speech impediment, but that she was not sure who raised the issue because she may have had prior knowledge of the appellant's speech problems. Stefanski repeatedly stated that she did not recall who brought up the issue of the speech impediment.

In her subsequent conversation with Hanna, Stefanski stated that she probably would not hire someone with a speech impediment, as she had a one-year-old child and she wanted someone who could speak clearly. Her recollection of this conversation is different from Hanna's. She repeatedly testified that she did not recall telling Hanna that the School indicated that placing the appellant with small children was not advisable due to the speech impediment.

The appellant sets forth one assignment of error:

"The trial court erred to the prejudice of plaintiff-appellant in granting defendants-appellees' motion for summary judgment by determining that plaintiff could not make out a *prima facie* case of handicap discrimination."

The appellant argues that she has presented a prima facie case of discrimination under R.C. 4112.02 because the appellees conditioned her admission to the School on a written recommendation from her physician. The appellant also asserts that she was discriminated against by English Nannies when Axler informed her she should not work with infants and toddlers, when she was told that she should only work with families of physicians, and when she was denied baby-sitting opportunities. The appellant argues that the trial court erred in granting the appellees' motion for summary judgment on the issues of misrepresentation and fraud, defamation and actual malice, intentional infliction of emotional distress, and tortious interference with contract.

Under Civ.R. 56, summary judgment is proper when no genuine issue as to any material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and it appears from the evidence that reasonable minds can come but to one conclusion, and, when the evidence is viewed most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to the party against whom the motion for summary judgment is·made. See *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 628 N.E.2d 1377; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267. It is well settled that the party seeking summary judgment bears the burden of showing that no genuine issue of material fact exists for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 604 N.E.2d 138. However, the nonmovant may not rely upon the mere allegations or denial in the pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Celotex, supra.*

Finally, the appellate court reviews the lower court's granting of the motion for summary judgment *de novo.* *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 622 N.E.2d 1153. The motion must be overruled if reasonable minds could find for the party opposing the motion. *Saunders v. McFaul* (1990), 71 Ohio App.3d 46, 593 N.E.2d 24.

The appellant has alleged that both the School and English Nannies have employed discriminatory practices against her. R.C. 4112.02 prohibits employment agencies from using discriminatory practices:

"It shall be an unlawful discriminatory practice:

"* * *

"(B) For an employment agency or personnel placement service, because of race, color, religion, sex, national origin, handicap, age, or ancestry, to do any of the following:

"(1) Refuse or fail to accept, register, classify properly, or refer for employment, or otherwise discriminate against any person;

"* * *

"(E) Except where based on a bona fide occupational qualification certified in advance by the commission, for any employer, employment agency, personnel placement service, or labor organization, prior to employment or admission to membership, to do any of the following:

"(1) Elicit or attempt to elicit any information concerning the race, color, religion, sex, national origin, handicap, age, or ancestry of an applicant for employment or membership;

"(2) Make or keep a record of the race, color, religion, sex, national origin, handicap, age, or ancestry of any applicant for employment or membership;

"(3) Use any form of application for employment, or personnel or membership blank, seeking to elicit information regarding race, color, religion, sex, national origin, handicap, age, or ancestry[.]"

We note that neither party cited R.C. 4112.022, which prohibits nonprofit educational institutions from discriminating against any individual on the basis of handicap. As no evidence has been presented that this section applies, it will not be considered by this court.

It must first be noted that the testimony given at the depositions of Axler and Goldberg clearly indicated that there is no practical distinction between the duties performed by the employees of the School and employees of the English Nannies. It is impossible, for the purposes of determining a motion for summary judgment, to distinctly attribute actions of the employees to one entity rather than the other. The employees appeared throughout to be acting for both entities at the same time.

For example, Axler conducted the preadmission interview with the appellant. The evidence demonstrates that Axler elicited information concerning the appellant's handicap, and based the appellant's admission on securing a physician's approval. The evidence also indicates that Axler, during the same interview, made assurances to the appellant regarding her employment placement. When considering the evidence in the light most favorable to the nonmoving party, the appellant, it is impossible to attribute one action to the School and one to English Nannies when such a distinction was not made clear to the appellant at the time, and, additionally, has never been made by the parties.

As set forth in the statute above, under R.C. 4112.02, it was an unlawful discriminatory practice for English Nannies to refuse to refer the appellant for employment positions, elicit information concerning the appellant's handicap, keep a record of the handicap, follow a policy of limiting employment opportunities based upon handicap, or use an application form seeking to elicit information regarding the handicap.

It must be noted that the preprinted application form did not request information regarding any handicapping condition. In this instance, however, a handwritten addition was made to the form that conditioned the appellant's admission upon a doctor's referral and recommendation.[1]

---

1. It is also interesting to note that the preprinted form indicates that the School has cause for dismissal if a student becomes pregnant or has an eating disorder.

The appellant presented evidence that her speech impediment was discussed at her interview, that her application form reflected the need for a doctor's recommendation and referral, that she was told that she would be placed only with families who did not have infants or toddlers because of her speech impediment, and that she should be placed only with physicians' families who would understand her medical condition. These sworn allegations are sufficient to raise a material issue of fact for a jury's consideration.

■ However, the appellant failed to present any admissible evidence that she was refused referrals for employment positions. The appellant testified that she learned from other students that baby-sitting positions and full-time positions were known to them, but not to her. This hearsay evidence is not sufficient to establish a material issue of fact indicating that the appellees engaged in the unlawful practice of refusing to refer the appellant for employment positions.

The appellant's first assignment of error is well taken on the issue of discrimination based upon handicap in violation of R.C. 4112.02.

■ Next, the appellant alleges that the appellees made misrepresentations amounting to fraud when they guaranteed finding her a position upon her graduation. The appellant asserts that Axler not only guaranteed that she would be placed as a nanny, but failed to indicate that finding such a position as a speech-impaired person would be difficult. The appellant argues that the appellees took her money, accepted her into school, promised her a job, and then, knowing this would severely limit her opportunities, informed her that she would not be placed with a family who had children under the age of five.

■ The Supreme Court reiterated the test for fraud in *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, 605 N.E.2d 936. Fraud consists of six elements: a representation of a fact, which is material, made falsely—either with knowledge of its falsity or utter disregard and recklessness as to falsity—with an intent to mislead, with justifiable reliance thereupon, and a resulting injury.

In the case *sub judice*, the appellant has failed to provide evidence that she relied on the appellees' representations. In fact, in her deposition, the appellant was asked if Axler said anything to her which was meant to be misleading or fraudulent. The appellant indicated that she understood the question, and responded, "But overall I was out of school. I wasn't stupid. I knew, you know, to look at the fine print. I knew what I was getting myself into."

Under *Celotex, supra,* the appellant failed in her burden to provide evidence of a required element of the cause of action, *i.e.,* detrimental reliance, and the court properly granted the appellees' motion for summary judgment on this issue.

■ Defamation is a false publication causing injury to a person's reputation or exposing him to public hatred, contempt, ridicule, shame or disgrace, or affecting the person adversely in the person's trade or business. *Rogers v. Buckel* (1992), 83 Ohio App.3d 653, 615 N.E.2d 669. Defamation may be either *per se* or *per quod;* slander *per se* is an issue of law for the trial court to decide. *Matalka v. Lagemann* (1985), 21 Ohio App.3d 134, 21 OBR 143, 486 N.E.2d 1220. Slander *per se* means that the slander is accomplished by the very words spoken. *Corradi v. Emmco Corp.* (Feb. 15, 1996), Cuyahoga App. No. 67407, unreported, 1996 WL 65822, citing *McCartney v. Oblates of St. Francis deSales* (1992), 80 Ohio App.3d 345, 609 N.E.2d 216. It is considered slander *per se* to use words which tend to injure one in one's trade or occupation. *Id.* The law in Ohio provides that, as to private persons, where a prima facie showing of defamation is made, a jury must determine by a preponderance of the evidence whether the defendant acted reasonably in attempting to discover the truth or falsity or defamatory character of publication. *Rogers, supra,* at 659, 615 N.E.2d at 672–673.

The appellant sets forth two instances of alleged defamation. The first is the alleged statements made by Axler to Stefanski. The second is a statement made by Axler to appellant's counsel during a telephone conversation.

In her deposition, Axler testified that she did not indicate to Stefanski that the appellant should not be considered for a position with young children based upon her speech impediment. Stefanski testified that she could not recall such statements. The appellant has failed to produce admissible evidence that Axler made any defamatory statements concerning the appellant to Stefanski.

■ Attached to the appellant's brief in opposition to the motion for summary judgment is the affidavit of attorney Lynn Lebit. Attorney Lebit affirmed that she was contacted by Axler in response to a letter regarding this case; that Axler stated it was her opinion that the appellant should not work with infants and small children because appellant's speech disability would cause young children to develop abnormal speech patterns; and that Axler stated that she had not investigated the truth of this assertion.

This affidavit is sufficient evidence to surmount summary judgment. The statement made by Axler was a false publication which would tend to injure the appellant's trade.

The appellant next argues that sufficient evidence of actual malice has been presented that would entitle her to punitive damages. The appellant argues that punitive damages are warranted under the theory of defamation and/or her claim for discrimination.

The test for punitive damages was set forth in *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, and reaffirmed in *Malone v. Courtyard by Marriott* (1996), 74 Ohio St.3d 440, 659 N.E.2d 1242. At paragraph one of the syllabus in *Preston,* the court held that actual malice, necessary for an award of punitive damages, is that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

The purpose of punitive damages is to punish the offender and set an example in order to deter others from similar behavior. Conscious, deliberate wrongdoing is required. *Preston, supra.* In addition, there must be something more than negligence. *Id.* This concept is reflected in the use of words such as outrageous, flagrant, and criminal; there must be a great probability of harm, and the harm must be substantial. *Id.*

In order to recover punitive damages on a claim for defamation *per se,* the appellant must separately prove either actual damages or show the appellee acted with actual malice. *Cashion v. Segal* (May 15, 1996), Summit App. No. 17411, unreported, 1996 WL 255980. In the context of a claim by a private figure in a defamation case, the same terms as used in *Preston, supra,* have been applied. The appellant must show "actual malice," meaning "anger, hatred, ill will, a spirit of revenge, or a reckless disregard of the consequences or the legal rights of others." *Keehan v. Reserve Industries Corp.* (June 6, 1996), Cuyahoga App. No. 69090, unreported, 1996 WL 303783, citing *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 543 N.E.2d 1277.

In the case before this court, the appellant failed to submit evidence that Axler spoke out of anger, hatred, or ill will, or with a spirit of revenge. Whether or not the statements made to Attorney Lebit were make in reckless disregard of the consequences or the appellant's legal rights is a closer question, but because these statements were made within the context of a pending suit, and were made to opposing counsel, it must be concluded that the statements do not meet the standard of actual malice needed to impose punitive damages.

The appellant failed to show that the defamation spoken by Axler was outrageous, flagrant or criminal, and, therefore, the trial court did not err in refusing to grant punitive damages on the issue of defamation.

The appellant also asserts that the court should have awarded punitive damages on the overall conduct of the appellees. As stated in *Preston,* in order to recover punitive damages, more than mere negligence is required. Although the appellant has set forth a cause of action for discrimination, she has failed to set forth conduct indicating that the particular circumstances of this case of discrimination are so egregious, *i.e.,* outrageous, flagrant, or criminal, as to

require punitive damages over and above those provided for by the statute. The trial court did not err in refusing to grant punitive damages.

▮ The appellant sets forth a claim that the cumulative conduct of the appellees amounted to an intentional infliction of emotional distress. In *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666, the court held that a claim for intentional infliction of emotional distress requires that one by extreme and outrageous conduct intentionally or recklessly cause serious emotional distress to another. It is not enough that a defendant act with intent which is tortious or criminal, or that there was an intent to inflict emotional distress, or that the conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability may be found only where the conduct goes beyond all possible bounds of decency, to be regarded as atrocious, and utterly intolerable in a civilized community. *Yeager, supra,* citing the Restatement of the Law 2d, Torts (1965) 71, Section 46, Comment *d.*

▮ From the conduct the appellant cites as culpable, a jury would be entitled to determine whether or not the appellees discriminated against her based upon her handicap. Although, if proven, the appellee's alleged conduct was reprehensible, the conduct was not so extreme or outrageous as to be intolerable in a civilized community.

The trial court properly granted the appellee's motion for summary judgment on the issue of intentional infliction of emotional distress.

▮ Likewise, the trial court properly granted the appellees' motion for summary judgment on the issue of tortious interference with contract. In *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863, the court held that in order to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damage. The appellant has failed to allege even that she was under contract with anyone, and has presented no evidence of a contract, and has failed to show that any breach of contract occurred.

The appellant's assignment of error is well taken in part and denied in part. The trial court properly granted the appellees' motion for summary judgment on the issues of misrepresentation and fraud, intentional infliction of emotional distress, tortious interference with contract, and malice. The court erred when it

granted the appellees' motion for summary judgment on the issue of discrimination based on handicap and on defamation.

*Judgment affirmed in part*
*and reversed in part.*

KARPINSKI, J., concurs.

NAHRA, J., concurs in part and dissents in part.

NAHRA, Judge, concurring and dissenting.

Appellees made inquiries regarding appellant's slight speech impediment and slight muscle weakness which affected her writing. They then admitted her. This hardly seems discriminatory in the ordinary meaning of the word, but I must admit that the mere fact of inquiry fits into the statutory prohibition. Indeed, asking or keeping a record of applicant's age is an "unlawful discriminatory practice." R.C. 4112.02(B)(1) and (2).

However, in my opinion a conversation with *appellant's* lawyer is not a "publication" so as to render appellees liable for defamation. Accordingly, I dissent from the majority's reversal of the summary judgment for appellees on the defamation.