OPINION
This litigation arises from an unfortunate encounter between Robert Stillwell and David Pazynski on April 4, 1997. At the time, Stillwell was a Xenia City Commissioner and Pazynski was a Xenia City police officer. On the day in question, Stillwell was en route to City Hall and had stopped his auto at a pedestrian crosswalk to let a woman cross. Pazynski was also in the process of crossing, but Stillwell apparently did not see him. As a result, Stillwell began to move his auto forward before Pazynski finished crossing. Factual disputes exist about what happened next, i.e, about whether the auto stopped short of the crosswalk, whether Pazynski had to jump out of the way, and whether Pazynski called Stillwell a "jerk," or simply told Stillwell he should stop for pedestrians.
The crosswalk was located near City Hall. Upon parking his car, Stillwell confronted Pazynski, who was walking toward City Hall. Stillwell was upset and angry, and asked Pazynski in a loud tone, "Do you have a problem?" Pazynski responded that he had a problem with people who did not stop at the crosswalk. At that point, Stillwell said, "Well, then, let's get it on!" Pazynski testified that Stillwell also yelled, "I am going to rip your head off!" Stillwell did not deny making this statement, but thought he made it at a later time, after the two men entered City Hall. In any event, both men agreed that Stillwell then shoved Pazynski in the chest with both hands.
At the time, Pazynski was not in uniform, but was dressed in blue jeans and a "DARE" T-shirt. After being shoved, Pazynski told Stillwell that he was a police officer. He also told Stillwell that he could be arrested if he continued. Pazynski testified that he would normally have made an arrest at that time. However, he did not arrest Stillwell because he was recovering from surgery and did not feel physically capable of making an arrest.
At this point, Stillwell insisted that Pazynski accompany him to the office of Charles Bowman, who was the Xenia City Manager. In the City hierarchy, Bowman answered to the City Commissioners, including Stillwell, but had administrative authority over various City departments, including the police.
When the two men arrived at Bowman's office, Stillwell, by his own admission, was not in control of himself. Stillwell threw his hat in the door of the office and then vented his frustration. Unquestionably, Stillwell did threaten at this time to rip Pazynski's head off. Bowman sat the two men down and tried to sort out what had happened. However, Stillwell became so angry during Pazynski's account of events that he stormed out of Bowman's office. Consequently, Pazynski finished telling Bowman what had happened and returned to work.
After leaving Bowman's office, Pazynski went downstairs to the police department and notified his supervisors (Lieutenant Prindle and Chief O'Malley) about the incident. Chief O'Malley instructed Pazynski to document what had happened. However, due to a prior commitment for the DARE program, Pazynski had to leave the station and did not immediately fill out a report.
In the meantime, Stillwell calmed down and came back to Bowman's office to discuss the incident. Subsequently, a radio message was sent to Pazynski at the DARE function, asking him to report back to the City Manager's office. From the testimony, it is apparent that Bowman wanted to defuse the situation with mutual apologies, even though he recognized that Pazynski had not done anything wrong. Specifically, Bowman told Pazynski to come up and that he probably needed to apologize. When Pazynski insisted that he had done nothing wrong, Bowman said, "Well, come up with something." Stillwell and Pazynski then met once more in Bowman's office. At that time, both men apologized and shook hands. Bowman thought that would be the end of the situation.
Pazynski knew that assaulting a police officer was a felony. However, Pazynski was not thinking about filing criminal charges when he met with Bowman. After the apology, Pazynski returned to his DARE function, went home for dinner, and then came back to the police station. At that time, he reported the incident to his supervisor, Sergeant Helling. Because Helling said a report needed to be made, Pazynski made a formal report. Again, Pazynski did not intend to put a felony charge in motion. Instead, he was simply documenting the incident, as he had been instructed. In the report, Pazynski outlined what had happened. He also complained of pain in his chest and ribs.
The incident took place on a Friday. When the Fraternal Order of Police (FOP) found out about the incident, the organization called for Stillwell's resignation. Chief O'Malley met with FOP representatives on Monday. At that time, the FOP asked if the police intended to pursue charges. O'Malley said the matter would be investigated like any other case, and assigned Lieutenant Houston to investigate. Subsequently, O'Malley met with Greene County prosecutors, Bill Schenck and Dave Mesaros, to discuss the incident. O'Malley told the prosecutors that the police department could not proceed further with its investigation because Bowman had refused to give a statement. At that time, Schenck decided to send the matter to the grand jury, who would hear the evidence and decide if charges should be filed.
Pazynski, Bowman, and another witness were subpoenaed, and did appear before the grand jury. After hearing testimony, the grand jury indicted Stillwell for assault of a police officer. The FOP also appeared at a City Commission meeting, and called for Stillwell's resignation. However, Stillwell did not resign as a result of this incident. He did later resign after an altercation with the City Manager in September, 1998. In that particular incident, the City Manager disagreed with Stillwell about a building permit for a church and corrected Stillwell's version of events. In response, Stillwell said, "If you say that one more time, I'm going to cross the room and knock your block off!" Stillwell started to throw a punch, but before he could connect, the Mayor intervened. The City Manager also filed a police report as a result of this incident. Stillwell's version was that he resigned because he was getting married and was building a house — not because of the altercation.
In any event, the felony assault charge against Stillwell case was tried to the bench before retired Judge Grigsby, on August 4, 1997. At the end of the State's case, the judge acquitted Stillwell. The criminal case was handled by Greene County prosecuting attorney, David Cusack. Before trial, Stillwell indicated willingness to plead guilty to a misdemeanor assault charge. Cusack conveyed information about the potential plea to O'Malley and Pazynski. However, Cusack stressed in his testimony that he had ultimate authority over decisions on any plea agreement. In fact, Cusack testified that he did not even ask O'Malley and Pazynski if they would agree to resolve the case on a misdemeanor basis. Instead, Cusack rejected any reduction because he felt the evidence supported a felony charge. Cusack also felt that even if the judge disagreed, Stillwell would be found guilty, at a minimum, of an assault. Therefore, a plea to that charge would not benefit the State.
After the acquittal, Stillwell filed a complaint against the City of Xenia and Pazynski, alleging malicious prosecution, infliction of emotional distress, and invasion of privacy. Defendants then filed a motion for summary judgment, based on their immunity from suit. Ultimately, the trial court granted summary judgment in favor of Defendants. First, the court found the City immune because no immunity exception applied. Next, the court found Pazynski immune because of a lack of evidence that Pazynski's actions were willful, wanton, or malicious. As a further matter, the court noted that the briefs of the parties did not discuss either invasion of privacy or infliction of emotional distress. However, the court also commented that both sides had orally agreed that if the motion for summary judgment were sustained, the case would be over. Consequently, the court dismissed the suit.
Stillwell now appeals, raising the following assignment of error:
 I. The trial court erred to the prejudice of Appellant by granting Appellees' motion for summary judgment.
After considering the record and the applicable law, we find that the trial court properly granted summary judgment in favor of the City of Xenia and Officer Pazynski. Accordingly, the judgment of the trial court will be affirmed.
 I
Because the validity of summary judgment is a question of law, we review summary judgment decisions de novo, and apply the same standards as the trial court. Long v. Tokai Bank of California (1996),114 Ohio App.3d 116, 119. "However, we do not weigh the evidence; we `accept the evidence properly before [us] and, with respect to the merit issues involved, construe the evidence most strongly in favor of the claims of the party against whom the motion is made.'" Id. (citation omitted). With these standards in mind, we turn to the specific arguments raised by Stillwell.
Within the first assignment of error, Stillwell presents two issues for review. The first deals with Officer Pazynski's immunity under R.C.2744.03(A)(6)(b). Specifically, under this statute, political subdivision employees are immune from liability unless their acts or omissions are done "with malicious purpose, in bad faith, or in a wanton or reckless manner." In this regard, Stillwell contends that factual issues exist concerning misrepresentations Pazynski made in the police report, in testimony before the grand jury, and in testimony at the criminal trial. As a preliminary point, we note that Stillwell points to no specific "misrepresentations" and we have not been able to find any established by the record.
As we said earlier, the basis of the suit against Pazynski was malicious prosecution. According to the Ohio Supreme Court:
 [t]he elements of the tort of malicious criminal prosecution are (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused.
Trussell v. General Motors Corp. (1990), 53 Ohio St.3d 142, syllabus. Malice has been defined as:
 the state of mind under which a person intentionally does a wrongful act without a reasonable lawful excuse and with the intent to inflict injury or under circumstances from which the law will infer an evil intent. * * * For purposes of malicious prosecution it means an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice.
Criss v. Springfield Twp. (1990), 56 Ohio St.3d 82, 84-85.
To show improper motive on Pazynski's part, Stillwell points to the following "facts": 1) Pazynski's initial apology, which allegedly led everyone to believe the matter was at rest; 2) Pazynski's attendance at a FOP meeting where Stillwell's resignation was requested; and 3) Pazynski's "zealous" participation in the criminal prosecution. Additionally, Stillwell relies on testimony from Sergeant Coy of the Xenia Police Department, who said that people in the police department, including Pazynski, wanted Stillwell removed from the City Commission.
At the outset, we note that the above claims are either unsupported by the record or are irrelevant to the issue of liability. First of all, the testimony clearly indicated that Pazynski "apologized" simply because he was told to do so by the City Manager, not because he felt he had done anything wrong. Construing the facts most strongly in Stillwell's favor, Stillwell thought Pazynski had called him a jerk and had walked toward him in a "threatening manner." This, Stillwell felt, justified his own conduct. However, no matter which version of the events one chooses to believe, the testimony clearly indicated that Pazynski apologized at the direction of his supervisors, not of his own volition.
Second, while both the City Manager and Chief O'Malley may have felt the incident had "blown over," their perception is irrelevant to the issue of whether a crime was, in fact, committed. In this regard, R.C.2903.13(A) prohibits any person from knowingly causing or attempting to cause physical harm to another. A violation of this section is a misdemeanor of the first degree. R.C. 2903.13(C). However, if the victim is a peace officer, assault is a felony of the fourth degree. R.C. 2903.13(C)(3).
Admittedly, Stillwell intended to and did strike Pazynski in the chest with both hands. Additionally, Pazynski complained of pain in his chest and arm in the report that was filed the night of the incident. He also sought medical attention for the injury a few days later, due to increasing soreness and inability to sleep. Under R.C. 2901.01(A)(3), "[p]hysical harm to persons" is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." Notably, no evidence was presented on summary judgment disputing any of these facts. Therefore, evidence existed to support a criminal assault charge, and we could find no fault, even if Pazynski filed a report with the intent of instituting criminal charges.
Again, however, the evidence is undisputed that Pazynski did not intend to file criminal charges at the time he filled out the report, nor did he ever actually file a complaint against Stillwell. Instead, Pazynski merely complied with his supervisors' orders to document what had happened.
As we mentioned, Stillwell also relies on Pazynski's attendance at a FOP meeting where Stillwell's resignation was requested. However, the record contains no evidence to this effect. Specifically, Pazynski denied attending any such meeting and no other witness testified to the contrary. Some FOP members did meet with Chief O'Malley, but Pazynski was not at that meeting.
However, even if Pazynski had attended these meetings, we are puzzled by why this would show an improper motive. Even with the facts construed in Stillwell's favor, Stillwell shoved or pushed a member of the public, was "out of control", i.e, engaged in behavior that showed poor anger management, and could be viewed as having abused his power as a City Commissioner when he forced the City Manager to intervene in what should have been a matter between the parties who were directly involved. Any citizen or group disturbed by this type of behavior could, under our democratic political process, call for the offending party's resignation. Whether the conduct warranted recall if Stillwell refused to resign would be a matter, ultimately, for the electorate to decide. We note that calls for resignation or recall of city commissioners or council members, for various reasons, are certainly not unique events in political life. See, e.g., R.C. 705.92, which establishes a recall process for elected municipal officers. Notably, persons circulating petitions for recall need not "allege even a specific ground, much less prove `good cause' for an officeholder's removal." Langley v. Fetterolf
(1993), 89 Ohio App.3d 14, 18. Therefore, even if Pazynski felt Stillwell should resign because of the shoving incident, the fact that he held such an opinion, or even communicated it to others, does not demonstrate that he had improper motives.
Concerning Stillwell's third factual argument, we see nothing "zealous" about Pazynski's participation in the prosecutorial process. The evidence indicates that Pazynski filed a report at the direction of his supervisors, that he was subpoenaed to testify before the grand jury (hardly a matter of choice), and that he testified at the criminal trial. These are all normal appearances for an alleged crime victim and do not give rise to a malicious prosecution claim simply because the State happens to lose the case.
The real claim Stillwell appears to be making is that the criminal prosecution was a ruse to oust him from office because he had taken stances opposing the FOP. However, the evidence in this regard is so slight as to be almost non-existent. Furthermore, to the extent any evidence exists, it does not implicate Pazynski. In this regard, Stillwell testified that he had taken a position against approval of the FOP contract and that FOP members he had talked to were upset. Stillwell indicated that this was opposition from a political standpoint rather than personal ill will or malice. However, even if malice existed, Stillwell did not name any individuals who were upset, nor did he identify Pazynski as someone with whom he had spoken. In fact, Stillwell testified that he did not remember ever meeting Pazynski before the crosswalk incident.
In contrast, other witnesses who testified, including Sergeant Coy, indicated that the FOP took little notice of Stillwell before the shoving incident. Again, this may create an issue of fact, but it is not material, because Stillwell offered no evidence indicating that Pazynski had any improper motive.
Sergeant Coy did testify that Chief O'Malley told police officers at a departmental meeting that Stillwell wanted to do away with a lieutenant's position. However, Coy testified that he could not say for certain if Pazynski was at this meeting, and also could not say if the information was communicated to Pazynski. Further, Coy said he never had any conversations with Pazynski about political stances taken by Stillwell. In fact, Coy said he was not aware of whether there was a political agenda by anyone that was behind pursing the criminal charges against Stillwell. Again, in the absence of something linking Pazynski to an improper motive, this evidence simply raises no material issues.
Just before the criminal trial, Coy heard a rumor that Stillwell was willing to plead to a misdemeanor. In this regard, Coy testified as follows:
 I had overheard a rumor that Mr. Stillwell was willing to plead to a misdemeanor and I asked David [Pazynski] about that, and I recall his response was that they said they couldn't get him off the commission if he pled to a misdemeanor.
Coy did not elaborate on the identity of who "they" were. Coy did refer to "locker room talk" to the effect that Chief O'Malley opposed reduction of the charge because Stillwell could not then be removed from the commission and the police would still have to deal with him. Again, Coy identified no specific sources of this information. Coy also said that he never heard O'Malley make such a statement.
Obviously, "locker room talk," i.e., a statement from unknown sources, is inadmissible hearsay, and does not create issues of material fact. See, e.g., State ex rel. Nix v. Cleveland (1998), 83 Ohio St.3d 379,384, and Bryans v. English Nanny and Governess School, Inc. (1996),117 Ohio App.3d 303, 315. However, even if we ignored this point, statements or actions attributed to Chief O'Malley do not establish malice on Pazynski's part.
As we mentioned earlier, the undisputed evidence was that the prosecutor, David Cusack, had sole authority and ultimate responsibility for deciding whether to accept Stillwell's proffered plea. Cusack informed Pazynski about the proposed plea bargain, but did not ask either Pazynski or Chief O'Malley if they would agree to resolve the case on that basis. To the contrary, Cusack indicated that he intended to try the case as a felony, "irrespective of what Pazynski's and O'Malley's position was." According to Stillwell, these facts should be discounted because the prosecutor's decision was only as good as the data on which it was based. However, as we stressed earlier, the record contains no evidence that Pazynski gave anyone false data.
Finally, we see nothing improper in the statement Pazynski made to Coy, i.e., that a misdemeanor conviction would not allow Stillwell's removal from the Commission. At the time this statement was made, the grand jury had indicted Stillwell on a felony charge and a trial was pending. As we pointed out, Pazynski was entitled, as the alleged victim, to think that Stillwell should be removed as a commissioner for his actions. Furthermore, the statement was factually true and was easily ascertainable from a review of Ohio law. Specifically, under R.C. 2961.01, persons convicted of a felony are incompetent by law to hold offices of honor, trust or profit. Ohio law has no similar provision barring persons from holding office who have been convicted of misdemeanors. R.C.2733.01(B) only authorizes the State to bring quo warranto actions to remove public officers who do acts which, by law, work a forfeiture of their office. Therefore, if Stillwell had been convicted of a felony, he could have been removed from office. See, e.g., State ex rel. Gains v.Rossi (1999), 86 Ohio St.3d 620, and State ex rel. Corrigan v. Haberek
(1988), 35 Ohio St.3d 150 (ordering removal of councilman after felony conviction). By the same token, Stillwell could not have been removed if he pled guilty to, or was convicted of a misdemeanor.
Based on the above discussion, we simply find no evidence in the record to support the claim that Officer Pazynski acted with malice. As a basis for inferring malice, however, Stillwell contends in his brief that probable cause for a felony assault charge did not exist. The basis of this argument is the lack of proof that Stillwell actually knew that the person in the crosswalk was an officer. According to Stillwell, such a failure of probable cause would allow malice on Pazynski's part to be inferred. Again, we disagree.
The record filed in the trial court does not indicate why the acquittal was granted. However, the explanation given in Defendants' motion for summary judgment was that Judge Grigsby felt the State failed to prove that Stillwell knew Pazynski was a police officer at the time of the assault. Stillwell seems to agree that this was the reason, as he bases the probable cause argument on his lack of knowledge that Pazynski was an officer. Assuming for the sake of argument that this was the reason for the acquittal, the decision was legally incorrect.
Specifically, in a similar context, we have held that a "defendant's knowledge that the victim is a peace officer is not required in order to invoke the enhanced penalty under R.C. 2903.11." State v. Cantrell, (March 24, 1989), Montgomery App. No. 11030, unreported, p. 4, appeal dismissed for want of prosecution, 46 Ohio St.3d 711. See also, e.g.,State v. Gimenez (Sept. 4, 1997), Cuyahoga App. No. 71190, unreported, p. 9, discretionary appeal not allowed (1998), 81 Ohio St.3d 1427 (noting that the fact that "victim was a peace officer simply enhances the degree of the offense and potential penalty. * * * Proof of knowledge on appellant's part is not required.")
R.C. 2903.11 is the felonious assault statute. Under R.C. 2903.11(D), felonious assault is increased to a first degree felony from a second degree felony where the victim is a peace officer. Similarly, R.C. 2903.13
covers assault, and R.C. 2903.13(C) allows assault to be increased from a first degree misdemeanor to a fourth degree felony where the victim is a peace officer. Because these statutes are nearly identical, the holding in Cantrell would apply for purposes of the enhanced penalty in R.C.2903.13(C), i.e., the State does not have to prove that the defendant knew the victim was a peace officer prior to the assault.
We also note that the Ninth District Court of Appeals has specifically held that an accused does not have to know that the victim is a peace officer for assault to be elevated under R.C. 2903.13(C). As the Ninth District said:
 [t]he General Assembly has articulated the elements of R.C. 2903.13 with sufficient clarity to indicate that the victim's status as a police officer shall elevate the criminal offense of assault from a misdemeanor of the first degree to a felony of the fourth degree regardless of whether or not the accused specifically knows of the victim's status as a peace officer.
State v. Freeman (Aug. 2, 2000), Medina App. No. 2999-M, unreported, p. 4.
Accordingly, if the acquittal was due to Stillwell's alleged lack of knowledge that Pazynski was an officer, Stillwell was the lucky beneficiary of the court's mistake. By the same token, Stillwell's alleged lack of knowledge has no effect on the existence of probable cause.
In granting summary judgment to Pazynski, the trial court relied on the presumption of probable cause provided by the grand jury's indictment. The court then found that reasonable minds could only conclude that in the exercise of independent judgment, the prosecutor took the case to the grand jury and prosecuted it without being influenced by improper considerations. Stillwell argues that the trial court was incorrect, because the indictment did not break the causal link. In this regard, Stillwell claims the indictment was not a new act since it is foreseeable that indictments may be based on improper and misleading testimony.
Even if such a situation is foreseeable, that is not what happened in the present case. As we stressed earlier, Stillwell presented no evidence that the indictment was based on misleading or perjured testimony, nor did he show any defect in the grand jury proceedings.
 In a malicious prosecution action, a grand jury indictment in the criminal prosecution creates a rebuttable presumption that defendants had probable cause to prosecute, unless the plaintiff shows those proceedings received perjured testimony or were otherwise significantly irregular. However, * * * grand jury evidence is usually secret and beyond the reach of a plaintiff. Therefore, * * * "[i]f one party relies on a presumption and his adversary introduces evidence of a substantial nature which counterbalances the presumption, it disappears."
Mayes v. Columbus (1995), 105 Ohio App.3d 728, 738 (citation omitted). We agree with the trial court that the indictment in this case created a rebuttable presumption that probable cause existed. We also agree that the presumption was not rebutted. And finally, we agree with the court's conclusions about the independent nature of the prosecutor's actions. In this regard, courts have held that:
 if an informer merely provides a statement of his belief of criminal activity and leaves the decision to prosecute entirely to the uncontrolled discretion of the prosecutor, or if the prosecutor conducts an independent investigation or prosecutes for an offense other than the one charged by the informer, the informer is not regarded as having instituted the criminal proceedings.
Robbins v. Fry (1991), 72 Ohio App.3d 360, 363, citing Archer v.Cachat (1956), 165 Ohio St. 286, 288.
Based on the preceding discussion, we find no issues of material fact concerning Officer Pazynski's immunity from liability. Even construing the evidence in Stillwell's favor, there is simply no evidence that Pazynski acted in a willful, wanton, reckless, or malicious manner. Instead, all Pazynski did is make out a report of an incident as directed by his supervisors. Accordingly, the first assignment of error is rejected insofar as it pertains to Officer Pazynski.
 II
The second issue raised in the first assignment of error concerns the liability of the City of Xenia. In this regard, Stillwell concedes that the immunity exception in R.C. 2744.03(A)(6) applies only to individual employees, not municipalities. Nonetheless, Stillwell says that the City should be liable for the fraudulent acts and misrepresentations of its employees. To support this argument, Stillwell cites case law pre-dating the effective date of the Political Subdivision Tort Liability Act. The pre-existing case law is Burr v. Bd. of Cty. Commrs. of Stark Cty. (1986), 23 Ohio St.3d 69, in which the Ohio Supreme Court held that:
 [t]he doctrine of sovereign immunity does not shield a political subdivision from responsibility for the fraudulent acts and misrepresentations of its employees and agents made in the performance of their activities.
Id., paragraph four of the syllabus.
Significant changes were made in the area of sovereign immunity when the legislature enacted the Political Subdivision Tort Liability Act. Under the current law, the proper analysis is dictated by Cater v. Cityof Cleveland (1998), 83 Ohio St.3d 24. In Cater, the Ohio Supreme Court indicated that a three-tier analysis should be used to evaluate the immunity given to political subdivisions. In the first tier, R.C.2744.02(A)(1) grants general immunity to subdivisions. However:
 [t]he immunity afforded a political subdivision in R.C. 2744.02(A)(1) is not absolute, but is, by its express terms, subject to the five exceptions to immunity listed in former R.C. 2744.02(B). * * * Thus, once immunity is established under R.C. 2744.02(A)(1), the second tier of analysis is whether any of the five exceptions to immunity in subsection (B) apply. * * * Finally, under the third tier of analysis, immunity can be reinstated if the political subdivision can successfully argue that one of the defenses contained in R.C. 2744.03 applies.
Id. at 28.
The acts involved in this case were unquestionably governmental functions under R.C. 2744.01(C)(2)(a),(b),(f), and (i). Therefore, the City is immune from suit unless one of the exceptions in R.C. 2744.02(B) applies. These exceptions generally involve: 1) negligent operation of vehicles by city employees; 2) negligence of employees in connection with proprietary functions; 3) failure to keep public roads in repair; 4) employee negligence that occurs within or on the grounds of buildings used in connection with the performance of a governmental function; and 5) situations where liability is expressly imposed by statute. Since none of these exceptions apply to the present case, Xenia could not be held liable even if Officer Pazynski had committed fraudulent acts. Compare Wilson v. Stark Cty. Dept. of Human Serv. (1994),70 Ohio St.3d 450. In Wilson, the plaintiffs alleged that employees of a county human services department had committed fraud when placing adoptive children in the plaintiffs' home. However, the Ohio Supreme Court rejected the claim, stating that "except as specifically provided in R.C. 2744.02(B)(1), (3), (4) and (5), with respect to governmental functions, political subdivisions retain their cloak of immunity from lawsuits stemming from employees' negligent or reckless acts." Id. at 452. Therefore, the court held that the political subdivision was not liable for the alleged intentional torts of fraud and intentional infliction of emotional distress. Id.
In view of the above analysis, we find that the trial court properly awarded summary judgment in favor of the City of Xenia.
Based on the preceding discussion, the single assignment of error is overruled and the judgment of the trial court is affirmed.
GRADY, J., and YOUNG, J., concur.
 ____________ Brogan, J.,